## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** )<br>)<br>) | |
| *Plaintiff,* )<br>) | |
| *v.* ) | **Civil Action No. 1:14-CV-192** |
| **ALLEN R. SMITH** )<br>) | |
| *Defendant*. )<br>)<br>) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      In 2011, Defendant Allen Ross Smith, a lawyer licensed to practice in the State of Florida, participated in an advance-fee high-yield investment scam perpetrated by Switzerland-based Malom Group AG ("Malom") – an acronym for "<u>M</u>ake <u>A</u> <u>L</u>ot <u>O</u>f <u>M</u>oney".

2.      Smith, leveraging his title and position as an attorney, made several false and misleading statements to investors regarding Malom's financial strength, its history of success, and his familiarity with Malom and its principals.  Several investors who received Smith's false and misleading statements entered into transactions with Malom; they lost all of their invested funds in the scam.

3.      Smith, as Malom's legal counsel, also passed on false assurances to several investors that refunds were imminent and would be funded through transactions that he had no involvement in and about which he had no first-hand knowledge.

1

4.      Smith also substantially assisted Malom in furtherance of its fraud by allowing Malom to use his attorney escrow account to accept investor funds and, at Malom's direction, by distributing those funds to those orchestrating the scheme in the United States and abroad. Through his attorney escrow account, Smith received and distributed approximately $2.44 million in investor funds for Malom.

5.      Finally, Smith offered and sold Malom securities in an unregistered transaction by making, as Malom's counsel, several required certifications regarding Malom and the transaction, and by communicating and negotiating with investors regarding various transactional documents.

6.      Through the conduct alleged in this complaint, Smith violated the anti-fraud and registration provisions of the federal securities laws.

## JURISDICTION AND VENUE

7.      The Commission brings this action, and this Court has jurisdiction over this action, pursuant to authority conferred by Section 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8.      This Court has personal jurisdiction over Defendant and venue is proper in the District of New Hampshire pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendant engaged in transactions, acts, practices, and courses of business constituting the violations alleged in this Complaint within this district.

9.       The Defendant, directly and indirectly, made use of the means and instrumentalities of interstate commerce, and the means and instruments of transportation and

communication in interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.     While carrying out the actions alleged in this Complaint, Defendant traveled to this judicial district and appeared on behalf of Malom as an attorney in the U.S. Bankruptcy Court for the District of New Hampshire.  The company in bankruptcy proceedings, USA Springs, Inc., is a New Hampshire-based company.  At the time of Defendant's conduct, USA Spring's principal place of business was Nottingham, New Hampshire.

## DEFENDANT AND RELATED PARTIES

11.     **Allen Ross Smith**, ("Defendant" or "Smith") is a resident of Winter Haven, Florida.  He is an attorney licensed to practice in Florida and has been a sole practitioner since 1977.  His primary practice area is criminal law.

12.     **Malom Group AG** is a company formed under the laws of Switzerland in 1973. Its principal place of business is Baar, Switzerland.  "Malom" is an acronym for "Make A Lot Of Money."  Malom and its principals, Martin U. Schläpfer and Hans-Jurg Lips are named as civil defendants in *SEC v. Malom Group AG, et al*., 2:13cv2280 (D. Nev. Dec. 16, 2013).  Lips and Schläpfer are named as criminal defendants in *United States v. Brandel*, 2:13cr489 (D. Nev. Dec. 11, 2013).  As of the date of this complaint, Schläpfer is incarcerated in Zurich, Switzerland, where he has been since September 2011 pending an investigation by Swiss authorities into investment fraud involving Malom Group's offer of joint venture and structured note agreements, as well as a separate fraudulent scheme that took place between 2003 and 2011 involving the sale of surety bonds by another company Schläpfer controlled.

13.     **James C. Warras**, age 67, is a resident of Waterford, Wisconsin and is the Executive Vice President of Malom.  According to publicly-available records, Warras has been convicted of securities fraud in Wisconsin twice, once in 1990, wherein he received a stayed sentence of two years imprisonment and five years' probation, and once in 2002, where he received another five years' probation.  As a condition of his probation, he was largely prohibited from offering or selling securities.  Warras was Smith's primary point of contact for Malom and the person who recruited Smith into the scheme.  Warras is named as a civil defendant in *SEC v. Malom Group AG, et al.*, 2:13cv2280 (D. Nev. Dec. 16, 2013) and as a criminal defendant in *United States v. Brandel*, 2:13cr489 (D. Nev. Dec. 11, 2013).

14.     **M.Y. Consultants, Inc.** is a consulting firm formed under the laws of Nevada in April 2007.  Its principal place of business was Las Vegas, Nevada.  Anthony Brandel served as its sole director.  It had few, if any, regular employees.  Through Brandel, M.Y. Consultants arranged transactions with Malom, handled investor funds, negotiated transaction documents, and communicated with investors.  During the scheme, Brandel would send investor funds to Smith, who would then distribute them to Schläpfer, Lips, Warras, and others.  M.Y. Consultants and its director, Brandel, are named as civil defendants in *SEC v. Malom Group AG, et al.*, 2:13cv2280 (D. Nev. Dec. 16, 2013).  Brandel is named as a criminal defendant in *United States v. Brandel*, 2:13cr489 (D. Nev. Dec. 11, 2013).

15.     **USA Springs, Inc.** is a New Hampshire-based corporation that is now in bankruptcy proceedings, *In re USA Springs, Inc.*, 1:08bk11816 (Bankr. D.N.H.).  After entering into bankruptcy, the company sought Malom's assistance in raising $60 million through a structured note debt offering.  Malom required a $1.2 million underwriting fee, which it and USA Springs secured from two investors.  Malom never created or attempted to create any debt

4

offering, the investors lost all their money, and the Bankruptcy Court entered a $60 million judgment against Malom in favor of USA Springs.  The bankruptcy proceedings remain open as of the date of this Complaint.

**FACTUAL ALLEGATIONS**

**I.     Malom's Offerings**

16.     From approximately August 2009 to fall 2011, Malom and its principals, agents, and promoters used the mail and wires to defraud at least 31 investors out of approximately $10.8 million through two schemes involving the offer and sale of securities: a joint venture offering and a structured note offering.  Of relevance to this Complaint is the structured note offering.

17.     Under the structured note offering, which began in early 2011 and lasted through fall 2011, Malom pledged to underwrite, securitize, "credit enhance", register, list, and market structured notes for companies who sought funding.  Malom promised to sell the structured notes on unspecified "Western European" exchanges and to privately place the notes with unspecified subscribers.  This offering resulted in at least six agreements and raised nearly $3.5 million.

18.     Malom failed to develop any funding through structured notes or otherwise, did not refund any investors' funds, and spent investors' funds on activities unrelated to the development of structured notes or other funding sources.

19.     In the structured note agreements, Malom required investors to pay an upfront "underwriting fee" or "deposit" that would be used for the structured note offering.  This was the investors' sole responsibility in the structured note transactions.

20.     The agreements underpinning the structured note transactions, generally deemed "Funding Commitments," did not purport to create any entities or partnerships, gave no

managerial or other authority to investors, and, other than the payment of the underwriting fee, placed no obligations on investors.

21.     If a transaction was successful, Malom agreed to refund the investor's underwriting fee with a 25-50% premium.  If a transaction was not successful, Malom agreed to refund the underwriting fee and pay a small penalty to the investor.  Generally, the structured note contracts anticipated successful transactions within 90-120 days after entering into an agreement, and thus would result in investors receiving a refund and either a success premium or penalty in that time.

22.     Malom did not undertake any steps to create or market any structured notes. Instead, the underwriting fees were immediately distributed among Defendant and others, many of which had no role in effecting the contemplated transactions.

23.     As an example in which the Defendant was intimately involved, in connection with the bankruptcy proceeding of USA Springs Inc. (*In re USA Springs, Inc.*, Case No. 08-11816 (Bankr. D. N.H. June 27, 2008)), Malom, USA Springs, and two investors (hereinafter the "USA Springs Investors") signed an "Investor Agreement" on or about June 23, 2011, whereby, for a $1.2 million underwriting fee paid by the investors, Malom would create and sell structured notes to raise $60 million for USA Springs to help it emerge from bankruptcy.

24.     The Investor Agreement stated that it was "necessary for a third party to invest and deposit with Malom [$1.2 million]" so that Malom could "underwrite, credit enhance and securitize the Note; cause the Note to be listed on a Western-European exchange; and privately place the Note to subscribers with whom [Malom] enjoys pre-existing relationships;" and that Malom would use the $1.2 million investment in furtherance of these duties.

25.     If the structured note offering was successful, the USA Springs Investors would receive a 50% return on their $1.2 million investment, and Malom would receive a success fee of 1.5% of the face value at maturity of the structured notes placed, and an origination fee of 3% of the principal funding amount of $60 million.

26.     If the effort was unsuccessful after 120 days, Malom promised to refund the USA Springs Investors' $1.2 million investment without deduction, and to pay them an additional $50,000 penalty.

27.     In other words, Malom guaranteed the USA Springs Investors either a 50% return on their investment within 120 days, or a complete refund plus an approximately 4% return.

28.     Malom failed to secure any funding, did not have any funds with which to refund the USA Springs Investors, and ultimately did not refund fees to them or any other structured note investor.

29.     When investors in the structured note offering began to demand results or refunds, including those involved in the USA Springs bankruptcy proceeding in which Defendant represented Malom, Malom made excuses for why it could not complete the transactions, usually blaming the European debt crisis, or offered an alternative investment to secure funding.

30.     In the case of USA Springs, after its 120 days expired in October 2011, Malom promised it would secure funding through transactions involving H-series Brazilian Letras do Tesouro Nacional ("LTNs") – bonds issued by the Brazilian government in 1972 that were purportedly worth in excess of US$200 million – as an alternative to a debt offering involving structured notes.

31.     These LTNs, however, are worthless forgeries.

32.     Well before Malom began telling investors it would repay them with these bonds and continuing until the present, the Brazilian National Treasury has hosted an English-language website unequivocally warning investors that "[a]ll LTN's issued in the seventies, in printed versions, had lost their value and are no longer valid," that "[a]ny documents about rescheduling these papers are an imitation intended to be passed off fraudulently or deceptively as genuine," and that "[a] number of law firms have generated negative outcomes for its clients, offering deals, presenting false evidences, with calculations attaching high values to those bonds."

33.     To assuage investors' concerns about this and other warnings, Malom, using investor funds, paid Campos e Campos Advogados, a Brazilian law firm, and one of its partners to acquire LTNs and to obtain a legal opinion and official documents explaining why and how the LTNs were valid and had value.  As part of this transaction, Campos e Campos also provided Malom forged government documents purporting to validate the bonds in question.

34.     Malom also forged documents as part of the LTN scheme, and, among others, used Smith to deliver these documents to investors.  On December 11, 2011, Defendant Smith, as counsel for Malom, sent counsel for USA Springs two emails purporting to each contain a "Safe-Keeping Receipt" from Merrill Lynch, dated December 1, 2011.  He received these documents from Warras.

35.     The first email, sent at 1:23 PM, contained what appeared to be a deposit receipt and an "Exhibit A" purporting to validate the Brazilian LTNs and make several claims about their authenticity and value.  "Exhibit A" contained multiple handwritten alterations reflecting changes to make the attachment appear as if it was issued by Merrill Lynch and signed by one of its employees.  For example, "Exhibit A" was handwritten on the top of the document, the original signatory's name, identifying information, and signature block was deleted, references to

Bank of America were crossed out and replaced with Merrill Lynch (and, in one case, "Merril Lynch"), and the name of a Merrill Lynch Vice President was written in print as well as a signature reflecting the same name. Warras's handwritten initials appear multiple times in the document next to the crossed-out words.

36.     Smith's second email to USA Spring's counsel, sent at 2:59 PM on December 1, 2011, contained an "updated Exhibit A," which was a document reflecting all of the handwritten changes contained in Smith's 1:23 PM email. This document was a forgery.

37.     Smith provided USA Springs with this document without having done any due diligence to determine whether it was authentic, and despite red flags indicating it was a fraudulent document, including that he had just forwarded a document to USA Spring's counsel that was clearly not from Merrill Lynch and that had multiple handwritten alterations, the deposit receipt contained two different types of handwriting, and the "updated" Exhibit A was not on Merrill Lynch letterhead.

38.     Had Defendant contacted Merrill Lynch or conducted a rudimentary internet search to ascertain the identity of the Merrill Lynch employee who purportedly signed the attachment, he would have found that the employee's name was misspelled.

39.     Using Smith as its intermediary, Malom provided these documents to the USA Springs Investors and others associated with USA Springs when it became clear that Malom was not going to be able to create a structured note and needed to convince the investors, creditors, and the bankruptcy court that it could still generate promised funding.

**II.     Smith's Involvement in Malom's Fraud**

40.     Smith's first point of contact with an individual associated with Malom was Malom's U.S.-based Executive Vice President, James C. Warras, whom he met in or about 2009.

41.     Warras engaged Smith to work as a "paymaster" for him and to a Trustee for Warras's trust, the Carpe Diem Family Trust.  As Warras's paymaster, Smith accepted funds into his attorney escrow account and an account he administered on behalf of the Trust and distributed them according to Warras's instructions.

42.     In Warras's emails to Smith, Warras described himself as both the Executive Vice President of Malom and as the Executive Vice President of NAS Operations AG.

43.     NAS Operations AG is an entity related to Malom and through which Malom's principal, Schläpfer, and others orchestrated a scheme to defraud through issuance of fraudulent surety bonds.

44.     At Warras's direction, Smith accepted funds into his attorney escrow account from M.Y. Consultants and Commercial Escrow Services, an escrow company into whose accounts investors deposited funds at the direction of M.Y. Consultants.

45.     Without exception, these funds belonged to investors that Malom and its agents had lured into fraudulent transactions.

46.     Per Warras's instructions, Smith distributed those funds to Malom's principals and others.

47.     For this "paymaster" service, Smith charged a fee equal to a percentage of the amounts deposited into his account, generally one percent, in addition to charging the wire transfer fees.

48.     In late 2010 or early 2011, Smith began to work directly for Malom.  He served as an attorney for Malom in connection with the USA Springs, Inc. transaction (*In re USA Springs, Inc.*, 1:08-bk-11816 (Bankr. D.N.H.), served as a "paymaster" in connection with the USA Springs transaction, and agreed to serve as a "paymaster" for other Malom transactions, having signed at least one agreement to be an "escrow officer" for a failed Malom transaction during this time.

49.     As he did when working as Warras's paymaster, Smith charged Malom a percentage, generally one percent, of the funds deposited into his attorney escrow account as a fee for acting as its paymaster.

50.     For example, on May 16, 2011, Warras sent Smith an email to inform him that $300,000 would be deposited into Smith's attorney escrow account.  Warras directed Smith to make four transfers, $100,000 to the "personal account" of Hans-Jurg Lips, $177,000 to the "personal account" of Martin Schläpfer, $15,000 to Warras's family trust, and $3,000 to Smith for his "escrow services."  Warras stated that the remaining $5,000 should be used to cover wire charges and otherwise held for further instructions.

51.     Similarly, on August 9, 2011, Smith received a wire transfer for $358,000 into his account from Commercial Escrow Services.  On the following day, Smith wrote one check, made five wire transfers, and made one electronic funds transfer to another account holder at his bank.  For this he charged a $4,000 fee as well as $175 to cover his costs.

52.     From the time he was first contacted by Warras through the events referenced in this Complaint, Smith conducted no independent due diligence on Malom.  The extent of what he knew about the company came from Warras or from Malom's principals, Martin Schläpfer and Hans-Jurg Lips.

53.     Tempted by the promise of ongoing and lucrative work as a "paymaster" for Malom, Smith regularly and continually parroted anything Malom and its agents needed him to say without question or hesitation.

### A.  Smith's Misrepresentations to Investors

#### a.  The "Certification as to Malom Group AG" Letter to Investors

54.     Shortly after beginning to work for Malom, on April 5, 2011, Malom's Compliance Officer, Las Vegas-based Joseph N. Micelli, sent an email to Smith requesting that he review an "attached certification letter" and asked Smith to let him know if Smith "would be prepared to send this letter to a couple of future clients when Tony [Anthony Brandel, Malom's agent in the United States and its primary recruiter] requires it."

55.     That same day, Smith replied to Micelli, stating that he "edited the proposed letter."  The letter (hereinafter, the "Certification as to Malom Group AG Letter"), as revised and signed by Smith on his letterhead and dated April 1, 2011, was delivered to several potential investors, including at least three who entered into structured note transactions with Malom. These three investors collectively paid $2.1 million to enter into transactions with Malom, who then funneled $1,858,000 of that total into Smith's attorney escrow account.

56.     In this letter, Smith made several material claims that he knew or was reckless in not knowing were false.

57.     Smith stated that he had "acted as an attorney-escrow agent for and on behalf of Malom Group AG with numerous contractual counter-parties for approximately three (3) years."

58.     This statement was false.  Smith had not acted on behalf of Malom for nearly three years.

59.     Furthermore, at the time he signed the letter Smith did not have any contact with "counter-parties" during the time he had worked for Malom.

60.     Smith stated that he worked with Malom concerning "transactions which required Malom Group AG to perform services measured in the hundreds of millions of US dollars."

61.     At the time he signed this letter, Smith had only worked with Malom in connection with the initial stages of one transaction, a nascent and as-yet unfinished structured note transaction with USA Springs that, if successful, would have totaled US$60 million, not "hundreds of millions of US dollars."  At the time he made this representation, USA Springs had not yet even identified an investor, whose funds were required to complete the transaction.

62.     Smith stated that "should a demand be made for the refund of any monies, Malom Group AG and its principals have more than sufficient liquidity to immediately tender payment."

63.     Smith had no basis on which to make representations about Malom's liquidity.  At the time of this statement, he conducted no due diligence on Malom and had no information about Malom other than what he was told by Malom's agents.  For example, Malom had not provided him with an audited or unaudited financial statement.

64.     Smith also had no basis on which to make representations about the liquidity of Malom's principals, Lips and Schläpfer.  He conducted no due diligence on Lips or Schläpfer and received no documentation independently verifying or confirming their respective financial conditions.

65.     Apart from oral statements by the principals themselves and others associated with the fraudulent scheme, the only evidence of Schläpfer's and Lips' financial condition Smith received was from a self-serving "Guarantee on 'Underwriting Fee,'" that purported to be a

personal guarantee from Lips to repay $1.2 million to the USA Springs Investors if the structured note transaction did not succeed within 90 days.

66.     This "Guarantee on 'Underwriting Fee'", however, made no reference to Lips' liquidity or assets, and was first issued <u>after</u> Smith signed and approved the April 1, 2011 Certification as to Malom Group AG Letter.

67.     Finally, Smith asserted that he knew "the principals of Malom Group AG to be of the highest moral and ethical character."

68.     Smith had no basis for claiming that Malom's principals, Lips and Schläpfer, were of the "highest moral and ethical character."  He had only spoken with them briefly by telephone, and had conducted no due diligence to confirm their backgrounds.

69.     If Smith was also referring to Warras, Malom's Executive Vice President, the claim is also without basis and Smith knew or should have known it lacked any basis.

70.     At the time, Warras had been convicted on state felony securities fraud charges twice, and spent more than a decade on probation, whereby he was largely prohibited from engaging in any securities transactions.  Information regarding Warras's background, a long-time resident of Wisconsin, was available, free of charge, through the Wisconsin court system's website.

71.     Furthermore, in direct contradiction of Smith's representation with respect to Schläpfer's high moral and ethical character, Smith had earlier been instructed by Warras to wire funds from his attorney escrow account to Schläpfer in Switzerland so as to make it "appear that they are coming from [a trust belonging to Warras] for the purchase of stock" to help Schläpfer avoid taxes in Switzerland.

72.     Smith obliged, stating in a reference line on seventeen separate international wire transfers to Schläpfer, totaling $1.7 million, variations of "For Purchase of Stock," "Purchase of Stock," and "Sale of Stock to Carpe Diem Family Trust."

73.     Smith's April 1, 2011 Certification as to Malom Group AG Letter was provided to several investors, at least three of whom relied on it when they decided to enter into transactions with Malom.

**b.  The April 2011 "Lulling Letters"**

74.     In the days after signing the April 1, 2011 Certification as to Malom Group AG Letter and endorsing the several misrepresentations it contained, representatives for M.Y. Consultants and Malom asked Smith to send several communications to investors who had already invested in transactions with Malom a year earlier and had yet to see any refund or return on their guaranteed investments.  These letters (collectively, the "Lulling Letters"), which promised refunds would come out of potential transactions that were close to fruition, were intended to lull these investors into inaction.

75.     As he had done in making the misrepresentations in the April 1, 2011 Certification as to Malom Group AG letter described above, Smith blindly repeated whatever he was told by people he either just met or never met.  He made no effort to conduct any due diligence on or verify any of the information contained in the letters he signed and sent to investors and the emails he sent to investors.

76.     For example, on April 7, 2011, at the request of Anthony Brandel of M.Y. Consultants, Smith signed a letter on his attorney letterhead, addressed "To Whom It May Concern," stating "As legal counsel for the Malom Group AG," that Brandel and M.Y. Consultants were actively involved with a "Senior Life Settlement" transaction with Malom

Group AG and that disbursements from the transaction were expected to start as early as that week.  The disbursements were supposed to be paid to investors who were seeking refunds from Malom.

77.     On April 14, 2011, when the promised "Senior Life Settlement" payout did not happen, Smith e-mailed another investor and promised that the transaction was close to being finalized.  He stated that once the funds were received into his escrow account, he would disburse a portion to the investor.

78.     On April 21, 2011, when the payout still did not happened, Smith emailed the investor, copying three other investors, and told them that the transaction was in the final stages and should be completed within the next 30 days.  Unlike his April 7, 2011 letter, where he purports to write as "legal counsel to Malom," here he disclaims his role as only an "escrow agent responsible for disbursing the funds I receive."

79.     Smith knew or was reckless in not knowing that the statements contained in these April 2011 Lulling Letters were materially false or misleading or omitted to state material facts which would make the statements he made not materially misleading.

### c.  The "USA Springs Certification Letter"

80.     As described above, Malom sought to enter into a transaction with USA Springs whereby Malom would secure $60 million in financing for USA Springs through the issuance of structured notes in Western Europe if the USA Springs Investors would pay a $1.2 million underwriting fee.

81.     As the purported "paymaster" for this transaction, as well as in his role as Malom's U.S. counsel, Smith stood to earn his customary one percent fee for providing Malom with "paymaster" services, an amount which totaled $12,000.

16

82.     Under the terms of the Investor Agreement, however, Smith, as Malom's counsel, was required to provide a certification that made several representations regarding Malom and the transaction.

83.     The Investor Agreement stated that:

"Malom …promises, covenants, warrants and agrees to do the following . . . Malom's counsel will present an opinion letter acceptable to the Investor asserting, among other things, that (a) counsel is fully familiar with the terms of the Investor Agreement, the Joint Escrow Instructions, the Guarantee of the Underwriting Fee, the Consent of Judgment, the Waiver of Protest, the Bank Draft, and the Funding Commitment; (b) the "Bank Draft" is an unconditional negotiable instrument that when issued by Malom shall be payable without protest upon its maturity and presentation to the Bank, EFG Bank (Zurich); (b) [sic] Malom has the financial capacity to immediately repay the "Owed Deposit"; (c) Malom is a solvent corporation (d) Malom is authorized to conduct the transaction contemplated in the "Funding Commitment"; (e) Malom has reviewed, agreed and has the authority to execute the "Investor Agreement"; (f) the Wechsel is a valid Bill of Exchange, and (g) Malom's counsel is authorized counsel to Malom and is authorized to provide such opion [sic]."

84.     On June 21, 2011, Smith provided the USA Springs Investors a letter complying with this requirement (hereinafter the "USA Springs Certification Letter"), and on June 27, 2011, he received his $12,000 fee out of the funds the USA Springs Investors deposited to underwrite the structured note transaction.

85.     In addition to his paymaster fee, Smith separately withdrew $800 to cover the costs of wire transfer fees and other unspecified costs.

86.     Smith made several misrepresentations in the USA Springs Certification Letter. As with the April 1, 2011 Certification as to Malom Group AG Letter and the April 2011 Lulling Letters, Smith agreed to make and ultimately did make these misrepresentations without question or reservation.

87.     He made "certifications" to the USA Springs Investors despite having conducted no due diligence on Malom or its principals, having no knowledge of Malom's financial

condition outside of oral statements made by Malom's agents and purportedly seeing bank statements they provided (which were fraudulent), and having had little or no experience in securities law, international transactional matters, or in validating Swiss banking instruments.

88.     Smith stated that a "Bank Draft" that was to be provided (and ultimately was provided) by Malom in favor of the USA Springs Investors was "an unconditional negotiable instrument that when issued by Malom shall be payable without protest upon its maturity and presentation to [EFG Bank in Zurich]."

89.     This representation, in which Smith effectively guaranteed that the USA Springs Investors could get their funds back from Malom's Swiss bank, was false.  In fact, at the time he made this statement, Malom had no funds on deposit at EFG Bank and had never had any funds deposited there.

90.     Smith stated that "Malom has the financial capacity to immediately repay the 'Owed Deposit'" [$1.2 million deposited by the investors].  It did not.

91.     He stated that "Malom is a solvent corporation."  It was not.

92.     And he stated that "Malom is authorized to conduct the transaction contemplated in the 'Funding Commitment.'"  Under the federal securities laws, it was not.

**B.  Smith Allowed Malom to Funnel Investor Funds Through His Attorney Escrow Account**

93.     Beginning with the USA Springs transaction, as Malom's self-described "paymaster," Smith received deposits into his attorney escrow account from several sources, including from Malom's Las Vegas-based agent, M.Y. Consultants, Inc., Commercial Escrow Services, and from at least one investor directly.

94.     After receiving these funds, Smith made no effort to determine whose funds he had actually received.  Smith then blindly followed instructions from Malom to wire those funds to accounts around the world.

95.     As a result of his involvement in the USA Springs transaction, and as evidenced by his June 21, 2011 USA Springs Certification Letter, Smith was intimately familiar with the structured note transactions for which Malom was seeking investors, including that the underwriting fees paid to Malom were to be used in connection with the structured note transactions.

96.     In each of the structured note transactions for which Smith handled funds, including in the USA Springs transaction, the Funding Commitment restricted the use of the underwriting fee to specific expenses actually related to the transaction.

97.     Smith knew or was reckless in not knowing of this limitation on the use of the funds he was responsible for handling.

98.     Smith, in his June 21, 2011 USA Springs Certification Letter to the USA Springs Investors, affirmed his "familiar[ity] with the terms of the Investor Agreement, the Joint Escrow Instructions, the Guarantee of the Underwriting Fee, [several documents required in the bankruptcy proceeding], and the Funding Commitment."

99.     Despite his familiarity with the restrictions on how underwriting fees were to be used, he blindly followed instructions to transfer by wire or check hundreds of thousands of dollars to individuals who had no apparent connection to the structured note transactions.

100.    For example, with respect to the $1.2 million invested in the USA Springs transaction, Smith made the following transfers between June 24, 2011 and June 27, 2011:

a. $175,000 to Campos e Campos Advogados, a Brazilian law firm, writing on the wire transfer "Lawyer's fees."  This firm played no role in the USA Springs transaction when this transfer was made.  However, it later purported to verify for Malom the validity and value of Brazilian LTNs from the 1970s that the Brazilian government publicly disclaims as either fraudulent or worthless.  As addressed above, LTNs were not contemplated as any part of the USA Springs transaction until October 2011, when Malom's period for performance on the structured note agreement expired.

b. $30,000 to ATP, Ltd., a company whose officer, Robert S. Michaels, was formerly associated with Schläpfer and who had recently been released from federal prison in connection with a fraud orchestrated by both Schläpfer and Michaels. Smith had no knowledge of this company or its role in the USA Springs transaction when he made this transfer.

c. $26,485 and $5,000 to Carpe Diem Family Trust, a trust Smith knew was owned and controlled by Warras.

d. $5,000 to Srdjan Veselinovich, a Texas resident with no known connection to the USA Springs transaction.  Smith did not know who he was or his role in the USA Springs transaction when he made this transfer.

e. $15,000 to Sila Schlaepfer, who Smith knew was either Martin Schläpfer's wife or ex-wife.

f. $25,000 to David Friedland, an attorney based in Florida and the Bahamas with no known connection to the USA Springs transaction.  Smith did not

know who he was or his role in the USA Springs transaction when he made

this transfer.

g.   $5,000 to Liberty Enterprise Investments, a "promoter" who had worked to

recruit other investors for Malom.  Smith had no knowledge of this company

or its role in the USA Springs transaction when he made this transfer.

h.   $2,600 to Michael Maryarksi.  Smith did not know who he was or his role in

the USA Springs transaction when he made this transfer.

101.    Although Smith knew that the underwriting fee could only be used for certain

expenses related to the USA Springs transaction, and despite his obligation to hold these funds in

trust for this purpose, he made no effort to investigate whether any of these recipients played any

role in the transaction.

102.    As Malom's "paymaster," Smith funneled approximately $2.44 million in

investor funds through his attorney escrow account between May and October 2011.  These were

funds from five defrauded investors.  For his escrow services, including his services in the USA

Springs transaction, Smith charged and received a total of approximately $39,280, all paid from

investor funds.  As discussed above, Smith earned thousands of dollars in most of these

paymaster transactions for doing nothing more than wiring funds out of his account to a limited

number of persons.

**III.    Smith Offered and Sold Malom Securities**

103.    Smith was a necessary participant and substantial factor in the offer and sale of

the structured note agreement to the two USA Springs Investors.

21

104. The structured note transaction with USA Springs took its form in two main documents, a "Funding Commitment" and an "Investor Agreement." Each agreement was signed by USA Springs, Malom, and the USA Springs Investors.

105. Taken together, these two documents created a transaction whereby the Investors provided Malom with $1.2 million that it would use to underwrite a structured note debt offering for USA Springs. With this structured note offering, Malom claimed it could raise $60 million for USA Springs. If successful, the USA Springs Investors would receive $1.8 million in return for their investment. If not, the USA Springs Investors would receive their initial investment of $1.2 million back, in addition to a $50,000 fee from Malom.

106. As Malom's attorney, Smith spent approximately 60-100 hours working on the USA Springs transaction. During this time, he communicated with the USA Springs Investors, representatives for USA Springs, creditors, and the bankruptcy court.

107. Smith also played a critical role in inducing the Investors into the transaction and assuaging their concerns by making several certifications regarding Malom and the transaction as Malom's only "United States legal counsel."

108. As described and quoted above, paragraph 83, the Investor Agreement required Malom's counsel, which was Defendant Smith, to provide the Investors with a certification letter making several representations about Malom, the transaction at issue, and documents associated with the transaction, including a Swiss financial instrument intended to guarantee the Investors' fee.

109. According to an April 22, 2011 "Letter of Understanding," from USA Springs' counsel to Malom and Smith, USA Springs and a then-unidentified investor required "certain minimum due diligence with respect to the protection and return of the [investor's funds] in the

event the funding transaction is not consummated," including the certification letter from Smith, as counsel for Malom.  This Letter of Understanding was counter-signed by Lips on behalf of Malom.

110.    Underscoring the importance of Smith's certification letter to the USA Springs Investors, the USA Springs Investors deposited their $1.2 million investment into an escrow account, which, under the terms of a June 21, 2011 Escrow Agreement between Malom, USA Springs, and the USA Springs Investors, could only be released to Malom after the USA Springs Investors received, among other documents, the certification letter from Smith.

111.    Smith issued a letter in conformance with this obligation on June 21, 2011 (the USA Springs Certification Letter).

112.    On June 27, 2011, USA Springs filed a motion with the bankruptcy asking the court to approve the investor agreement, among other actions.  In this motion, USA Springs described several of the material terms of the agreements between USA Springs and Malom and USA Springs, Malom, and the USA Springs Investors.  In this summary, USA Springs specifically cited the requirement that Smith provide the certification.

113.    In this motion, USA Springs also highlights the import of Malom's agreement to pay the Investor a success fee, its agreement to repay the Investor should the transaction fail, and the importance of the "Additional Protections" contained in the Investor Agreement, which includes Smith's certification, concluding that without the Investor Agreement, the structured note agreement between Malom and USA Springs would fail.

### COUNT ONE
### Violation of Exchange Act Section 10(b) and Rule 10b-5

114.    The Commission realleges and incorporates herein by reference paragraphs 1 through 113 above.

115.    Defendant, directly and indirectly, with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of business which have been and are operating as a fraud or deceit upon the purchasers or sellers of securities.

116.    As a part of and in furtherance of their scheme, Defendant, directly and indirectly, prepared, disseminated, or used contracts, written offering documents, promotional materials, bank documents, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 115 above.

117.    By reason of the foregoing, Defendant has violated and, unless restrained and enjoined, will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT TWO
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

118.    The Commission realleges and incorporates herein by reference paragraphs 1 through 117 above.

119.    Pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Defendant at least recklessly aided and abetted Malom by providing it with substantial assistance in furtherance of its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

120.     Furthermore, Defendant at least recklessly aided and abetted M.Y. Consultants by providing it with substantial assistance in furtherance of its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT THREE
### Violation of Securities Act Section 17(a)

121.     The Commission realleges and incorporates herein by reference paragraphs 1 through 120 above.

122.     Defendant, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) has employed, is employing, or is about to employ devices, schemes or artifices to defraud; (b) has obtained, is obtaining or is about to obtain money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) has engaged, is engaged, or is about to engage in transactions, acts, practices and courses of business that operated or would operate as a fraud upon purchasers of securities.

123.     By reason of the foregoing, Defendant has violated and, unless restrained and enjoined, will continue to violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## COUNT FOUR
### Aiding and Abetting Violations of Securities Act Section 17(a)

124.     The Commission realleges and incorporates herein by reference paragraphs 1 through 123 above.

125.     Pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], Defendant knowingly or at least recklessly aided and abetted Malom and M.Y. Consultants by providing them with substantial assistance in furtherance of their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## COUNT FIVE
### Violation of Securities Act Section 5

126.    The Commission realleges and incorporates herein by reference paragraphs 1 through 125 above.

127.    Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise, and carried or caused to be carried through the mails or in interstate commerce, such securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and no legally recognized exemption from registration applied.

128.    By reason of the foregoing, Defendant violated and unless restrained and enjoined, will continue to violate Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that Defendant violated the federal securities laws and Commission rules alleged against them in this Complaint;

### II.

Permanently enjoin Defendant from further violations of the federal securities laws and Commission rules alleged in this Complaint;

### III.

Permanently enjoin Defendant from directly or indirectly participating in the issuance, offer, or sale of any security, including but not limited to joint venture agreements, proofs of

funds, bank guarantees, medium term notes, standby letters of credit, structured notes, and similar instruments, with the exception of the purchase or sale of securities listed on a national securities exchange;

### IV.

Order Defendant to disgorge, as the Court may direct, all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment interest thereon;

### V.

Order Defendant to pay civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

### VI.

Grant such other equitable and legal relief as may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

Date:  May 2, 2014                    By:

_/s/ Stephen W. Simpson_____
Stephen W. Simpson
Timothy N. England
Stephen L. Cohen

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Fax: 202.772.9228
simpsons@sec.gov /  Tel. 202.551.4513
englandt@sec.gov  /  Tel. 202.551.4959
cohens@sec.gov    /  Tel. 202.551.4472