**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Securities and Exchange Commission**

    **v.**                                   Civil No. 14-cv-192-PB
                                          Opinion No. 2015 DNH 134
**Allen R. Smith**

**MEMORANDUM AND ORDER**

The Securities and Exchange Commission (the "SEC") claims
in this securities fraud action that Allen Smith participated in
an advance-fee investment fraud scheme in his capacity as an
attorney and fiduciary.  The SEC now moves for summary judgment
and asks the court to impose injunctive relief, disgorgement,
and a monetary civil penalty against Smith.  Most of the SEC's
claims require proof of scienter, which ordinarily must be
resolved during a trial.  Here, however, the SEC has produced
compelling evidence of Smith's involvement in the fraud, and
Smith's meager opposition to the SEC's motion neither identifies
a genuine dispute of material fact nor explains why the SEC's
motion should be denied.  Accordingly, I determine that the SEC
is entitled to summary judgment on both its substantive claims
and its requests for disgorgement and permanent injunctive
relief.  But because the SEC's claim for a monetary penalty
requires further factual and legal development, I deny the SEC's

request for a civil monetary penalty without prejudice to its
right to renew its request in a properly supported motion.

## I.   BACKGROUND

The SEC alleges that Smith participated in an investment
fraud scheme in his capacity as an attorney and fiduciary.  I
first summarize the scheme itself and then describe Smith's
involvement.

### A.   The Fraudulent Scheme

Between 2009 and 2011, Martin Schläpfer, James Warras, and
Hans-Jurg Lips (the "Principals") conducted an advance-fee
investment scam that defrauded more than 30 investors out of
over $10.8 million.  The Principals conducted their fraud
through a number of business entities, including:

- Malom Group AG (with "Malom" being an acronym for "make a
  lot of money"), a Swiss business organization run by
  Schläpfer and Lips.

- Northamerican Sureties (Europe) AG ("NAS Europe"), another
  Swiss business organization where both Schläpfer and Warras
  served as executives.

- Northamerican Sureties Ltd. ("NAS Ltd."), a Utah
  organization that specialized in issuing surety bonds
  guaranteeing loan performance.  Although Schläpfer was a
  board member of both NAS Europe and NAS Ltd., the two firms
  were separate entities.

- M.Y. Consultants, Inc., a Nevada firm with few, if any,
  regular employees that facilitated Malom's transactions

with investors.

- Maxmore Corporation Ltd., a Hong Kong business organization of which both Schläpfer and Warras were principals.

The Principals devised two separate investment scams.  The first, which the SEC calls the "joint venture offering," lasted from August 2009 until August 2011.  For an advance fee of between $150,000 and $200,000, this scam invited investors to enter into joint venture arrangements with several of the business entities controlled by the Principals, most frequently Maxmore.  Those entities, the Principals claimed, would then use their capital to purchase U.S. treasury securities at a discount, resell them for a 100 percent profit, and repeat the cycle, generating a significant yield on the investors' original contribution.  In fact, the entire arrangement was fraudulent; no such trades ever took place.  The Principals raised $7.5 million through 25 such joint venture agreements, $7.3 million of which was lost to the fraud's victims.

The second scam, which the SEC calls the "structured note offering," lasted from February 2011 until the fall of 2011. Unlike the joint venture offering, the Principals conducted the structured note offering only through the Malom entity.  Through this scam, the Principals would invite investors to contribute an "underwriting fee" that would allow the Principals to

securitize, register, and issue "structured notes" in various
and unspecified "Western European exchanges."  Once issued, the
Principals promised, these securities would generate significant
returns on the investors' initial contributions.  As with the
joint venture offering, the structured note offering was
fraudulent; no notes were ever created or traded.  Six investors
were defrauded out of $3.35 million through the structured note
offering scam.  One of these investors was USA Springs, Inc., a
New Hampshire firm that was undergoing bankruptcy proceedings in
this District when, seeking to raise new financing for its
restructuring plan, it agreed to participate in the offering.

Based on their alleged involvement in the scheme,
Schläpfer, Lips, Warras, and the Malom entity are all named as
defendants in an SEC civil enforcement action in the District of
Nevada.[1]  This action is stayed pending resolution of a separate
criminal action in that District against the same defendants,
which also arises from their involvement in the scheme.[2]

---

[1] The civil action pending in the District of Nevada is <u>SEC v.
Malom Group AG</u>, 2:13cv2280.

[2] The criminal action pending in the District of Nevada is <u>United
States v. Brandel</u>, 2:13cr489.

B.   __Smith's Involvement__

Smith, a licensed attorney, was admitted to the Florida bar in 1974.  Since then, he has practiced mostly criminal law, although he has done some civil work as well.  He has no experience in international banking and finance, structured notes, or bank instruments.  In 2008, Smith began to accept work as a "paymaster" for several clients engaged in various financial investment transactions.  As paymaster, Smith would receive third-party investor funds into his attorney trust account, which he would then disburse either to his clients or to other third parties at his clients' direction.

Smith's involvement with the scheme's Principals began in late 2008, when Smith met Warras, who was then the executive vice president of NAS Europe.  Between 2008 and 2010, Smith's involvement with the Principals and their business entities was minimal.  In April 2010, however, Smith began to act as a paymaster for NAS Europe, Malom, and some of the other business entities used by the Principals.  In this capacity, Smith received and disbursed millions of dollars of funds received from investors who had been deceived into participating in the two fraudulent schemes.

5

Smith's role in the scheme expanded in early 2011, when he agreed to represent Malom as its attorney.  In that role, Smith made a number of material statements that proved to be false in a series of communications to prospective investors whom the Principals were trying to persuade to invest in their schemes.  These communications and misrepresentations include:

- An April 2011 certification letter to prospective investors.  Although one of the Principals' associates appears to have drafted the letter, Smith signed it and placed it on his attorney letterhead.  Knowing that the Principals planned to show the letter to prospective investors, Smith made a number of material representations in the letter that appear to be false based on the summary judgment record.  These include a claim that Smith had represented Malom in transactions "measured in the hundreds of millions of US dollars" and a certification that Malom had sufficient liquidity to honor refund requests from investors.[3]

- A series of letters and emails, which the SEC calls the "lulling communications," that the Principals asked Smith to send to investors who had already invested in the scheme but had not yet received any refund or return on their investments.  Smith did so shortly after he signed the April 2011 certification letter.  In these communications, Smith assured the investors that the Principals were working on a "Senior Life Settlement" transaction that would yield investors their promised returns within one week.  In fact, no "Senior Life Settlement" transaction ever existed.  The SEC alleges that the Principals asked

---

[3] Smith also wrote in the April 2011 letter that he "[knew] the principals of Malom Group AG to be of the highest moral and ethical character."  That assessment, of course, is at best dubious.

Smith to send these communications to the fraud's victims
to lull them into inaction.

- A series of communications to USA Springs, Inc., a New
  Hampshire firm undergoing bankruptcy proceedings in this
  District that needed to find a new source of financing to
  avoid liquidation.  Beginning in early 2011, Malom's
  Principals sought to raise $2.4 million from USA Springs,
  which they characterized as an "underwriting fee," through
  their structured note offering fraud.  As part of this
  effort, Smith sent USA Springs a number of emails
  containing misrepresentations similar to those he made in
  the April 2011 certification letter – for instance, that
  Malom had conducted transactions involving hundreds of
  millions of dollars and that Malom and its Principals had
  sufficient liquidity to honor refund requests.  Smith
  repeated these misrepresentations during multiple telephone
  calls and personal meetings with both USA Springs officials
  and attorneys and the Creditors' Committee for the USA
  Springs bankruptcy.  USA Springs, convinced that Malom was
  legitimate and that Malom's structured note offering was
  viable, finally agreed to invest with Malom.  Malom allowed
  USA Springs to participate for a reduced "underwriting fee"
  of $1.2 million, which USA Springs raised from third-party
  investors.

- A "certification" regarding Malom that Malom was required
  to submit as part of its transaction with USA Springs.  The
  certification, which Smith signed, contained a number of
  apparent misrepresentations, most notably Smith's
  verification that USA Springs' investment was secured by a
  freely assignable and negotiable "bank draft" issued by a
  certain Swiss bank.  In fact, Malom held no assets at that
  bank at the time Smith made this statement.  No such
  instrument ever existed, at least authentically.

Smith received $39,525 from Malom in compensation for his

paymaster work and legal representation, all of which originated

from investor funds.  His participation in the fraud contributed

to the decisions of at least four investors to invest their

7

money in the scheme, causing them to lose over $2 million.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Where, as here, the moving party bears the burden of proof, summary judgment may not issue "unless the evidence that [the moving party] provides . . . is conclusive." Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998).  In other words, if "the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence – using any of the materials specified in Rule 56(c) – that would entitle it to a directed verdict if not controverted at trial." Winnacunnet Coop. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 84 F.3d 32, 35 (1st Cir. 1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting on other grounds)).

To meet this rigorous standard, the moving party must first offer properly pleaded facts of evidentiary quality sufficient to show the absence of any genuine dispute of material fact related to its claims.  In re Varrasso, 37 F.3d 760, 763 (1st

8

Cir. 1994).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  I must then consider the proffered evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor.  Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).  I may grant summary judgment only if no reasonable finder of fact could find for the nonmoving party after evaluating the moving party's proffer in this light.  EEOC v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados, 279 F.3d 49, 55 (citing Calderone v. United States, 799 F.2d 254, 258 (6th Cir. 1986)).

If the moving party meets this initial burden, the nonmoving party must then demonstrate, "through submissions of an evidentiary quality, that a trialworthy issue persists." Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st Cir. 2012).  To meet this burden, the nonmoving party may either produce its own submissions of evidentiary quality that evince a genuine dispute of material fact or explain why the moving party's proffer does not demonstrate the absence of such a dispute.  Fed. R. Civ. P. 56(c)(1); Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008).  The nonmoving party may not, however, "rest[] merely

9

upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); see also Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) ("A genuine issue of material fact does not spring into being simply because a litigant claims that one exists.").  If the nonmoving party fails to meet its burden in this way, a court may deem the moving party's proffer admitted and undisputed for purposes of summary judgment.  Fed. R. Civ. P. 56(e)(2); LR 56.1(b); Stonkus v. City of Brockton Sch. Dept., 322 F.3d 97, 102 (1st Cir. 2003).

### III.  ANALYSIS

The SEC raises five claims for relief.  Count One alleges that Smith violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Count Three raises the closely related claim that Smith violated Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a).  Counts Two and Four invoke 15 U.S.C. §§ 77o(b) and 78t(e) to allege that Smith aided and abetted primary violations of both provisions committed by the fraud's Principals and the

10

business organizations that they controlled.  Finally, Count
Five alleges that Smith violated Section 5 of the Securities
Act, 15 U.S.C. § 77e.

The SEC supports its summary judgment motion with a
detailed statement of uncontested material facts citing
extensive evidence demonstrating Smith's involvement in the
Principals' security fraud scheme.  See Doc. No. 25; LR 56.1(a).
Smith has responded with a two-and-a-half page memorandum that
offers only general and conclusory denials of the SEC's claims
and contains no statement of material facts as required by Local
Rule 56.1(b).  See LR 56.1(b); Griggs-Ryan v. Smith, 904 F.2d
112, 115 (1st Cir. 1990) ("A genuine dispute of material fact
does not spring into being simply because a litigant claims that
one exists.").  Accordingly, I accept as true each of the SEC's
properly supported factual averments in evaluating the
evidentiary sufficiency of its claims for relief.  See Fed. R.
Civ. P. 56(e)(2); LR 56.1(b); Stonkus v. City of Brockton Sch.
Dept., 322 F.3d 97, 102 (1st Cir. 2003).

**A.  Counts One and Three: Violation of Exchange Act Section
10(b), SEC Rule 10b-5, and Securities Act 17(a)**

Rule 10b-5 implements the statutory prohibitions of Section
10(b).  Aaron v. SEC, 446 U.S. 680, 687-88 (1980).  To prevail
on its Rule 10b-5 claim, the SEC must prove the following

elements: (1) that Smith made a material misrepresentation or
omission, or otherwise committed a manipulative or deceptive act
as part of a scheme to defraud; (2) in connection with the
purchase or sale of securities; (3) through the means or
instruments of transportation or communication in interstate
commerce or the mails; (4) with the requisite scienter.  See 15
U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; SEC v. Tambone, 417 F.
Supp. 2d 127, 131 (D. Mass. 2006).  In the context of this case,
a claim under Section 17(a) entails the same four elements as a
Rule 10b-5 claim; therefore, I address the SEC's Rule 10b-5
claim in Count One and its Section 17(a) claim in Count Three
jointly.[4]  See 15 U.S.C. § 77q(a); Tambone, 417 F. Supp. 2d at
131.

    Of these four elements, Smith contests only the SEC's
allegation that he acted with the requisite scienter.  The First
Circuit has explained that scienter, as an element of a Rule
10b-5 claim, is

---

[4] More specifically, like Rule 10b-5, the scienter element of
Section 17(a)(1) requires either direct knowledge or extreme
recklessness.  SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008).
By contrast, claims under Sections 17(a)(2) and 17(a)(3) contain
the same elements as Rule 10b-5 but require only negligence, not
the extreme recklessness or direct knowledge that Section
17(a)(1) and Rule 10b-5 demand.  Id.  Because I conclude that
Smith acted with extreme recklessness, this distinction is of no
consequence here.

an intention to deceive, manipulate, or defraud.  In
this circuit, proving scienter requires a showing of
either conscious intent to defraud or a high degree of
recklessness.  Recklessness is a highly unreasonable
omission, involving not merely simple, or even
inexcusable negligence, but an extreme departure from
the standards of ordinary care, and which presents a
danger of misleading buyers or sellers that is either
known to the defendant or is so obvious the actor must
have been aware of it.

SEC v. Ficken, 546 F.3d 45, 47-48 (1st Cir. 2008) (internal

quotation, omission, and citation omitted).

        The SEC identifies myriad instances of alleged material

misrepresentations that it claims Smith made with at least

extreme recklessness, but for purposes of this motion, it is

enough to take one such misrepresentation as an example.[5]  In his

---

[5] Although I can decide this motion by following this approach,
the SEC would have been better served to organize and analyze
its case violation by violation, and element by element for each
violation.  Instead, in both its complaint and its motion for
summary judgment, the SEC describes Smith's particular
misrepresentations – the actual instances of securities law
violations – within a larger narrative of Smith's involvement in
the scheme.  It then offers legal arguments without specifically
applying them to these alleged misrepresentations, particularly
in its discussion about scienter.  The five counts in its
complaint identify the securities law provisions that the SEC
claims Smith violated, but the complaint does not attribute
particular instances of unlawful conduct to each of these
provisions.  This structure makes it difficult to determine
which of the SEC's legal arguments attaches to each
misrepresentation, and it makes it impossible to determine
exactly how many securities violations the SEC alleges that
Smith committed.  One of my colleagues on this Court has
cautioned the SEC about such "shotgun pleading" and "puzzle
pleading" in the past.  SEC v. Patel, 2009 DNH 143, 5.

April 2011 certification letter to prospective investors, Smith
wrote: "Moreover, from my personal knowledge, I hereby affirm
that, should a demand be made for the refund of any monies,
Malom Group AG and its principals have more than sufficient
liquidity to immediately tender payment."  Doc. No. 17-4 at 2.
In fact – and as Smith does not dispute, at least not
sufficiently for purposes of summary judgment – Malom remained
insolvent for the duration of this period, and there is no
indication that any of Malom's Principals had nearly sufficient
liquidity to honor refund requests.  Smith's statement,
therefore, was false.  Nor does Smith dispute either that his
misrepresentation was material or that he made it both in the
channels of interstate commerce and in connection with the sale
of securities.  Accordingly, the summary judgment record
demonstrates that Smith's statement in the April 2011 letter
clearly satisfies each of the first three elements of the SEC's
Rule 10b-5 and Section 17(a) claims.[6]  The only question that

_____

(McAuliffe, J.).

[6] There is no question that Smith's misrepresentation was
material, since Smith's certification of Malom's liquidity was
substantially likely to incline a reasonable investor to
participate in the fraudulent scheme.  See Ficken, 546 F.3d at
47 ("A misrepresentation is material if there is a substantial
likelihood that the misrepresentation would affect the behavior
of a reasonable investor.")  Moreover, there is no question that

remains, therefore, is whether Smith made his statement with the
requisite level of scienter.

The SEC argues that the summary judgment record compels the
conclusion that Smith acted with extreme recklessness, and
therefore with scienter, when he misrepresented Malom's
liquidity in the April 2011 certification letter.  That is so,
the SEC contends, because although Smith knew that prospective
investors would rely on his statement, he lacked any legitimate
basis for making it.  To support this assertion, the SEC
explains that Smith was asked during discovery to identify the
bases for his statement regarding Malom's liquidity.   In
response, Smith pointed to the following two sets of materials:

- A 2007 unaudited financial statement regarding
  Northamerican Sureties.  This statement, however, was
  already four years old when Smith signed the April 2011
  certification letter.  Moreover, the statement addresses
  the financial condition of Northamerican Sureties, a
  separate entity from Malom.  The 2007 statement, in short,
  says nothing about Malom's financial condition in April

Smith's misrepresentation was made in connection with the
purchase or sale of securities.  Both the joint venture offering
and structured note offering "[sought] the use of the money of
others on the promise of profits."  SEC v. W.J. Howey Co., 328
U.S. 293, 299 (1946).  And finally, there is no question that
Smith made his misrepresentation through the facilities of
interstate commerce.  The scheme, including Smith's involvement,
involved the use of email, telephone calls, the mail, and
interstate travel (for instance, to New Hampshire to recruit USA
Springs as an investor).  See SEC v. Softpoint, Inc., 958 F.
Supp. 846, 865 (S.D.N.Y. 1997).

2011 and provided Smith with no legitimate basis to make
any representation about Malom's liquidity at that time.

- A group of documents – apparently Malom's own marketing
  materials – that Smith received from Warras on April 19,
  2011, which discussed new financial products that Malom
  planned to sell in Europe.  But Warras did not give Smith
  these materials until after Smith had already executed the
  April 2011 certification letter, and so they could not
  logically have provided Smith with any basis to make any
  representation about Malom's liquidity at the time he made
  his statement.  Moreover, the documents speak only about
  future instruments that Malom was planning to offer, not
  Malom's present liquidity.

Other than these materials – none of which support any
representation about Malom's liquidity in April 2011 –
Smith relied only on what Warras, Schläpfer, and Lips told
him about Malom's financial condition when he signed the
April 2011 certification letter.  He neither asked for nor
received any genuine financial documents such as financial
statements, tax records, or bank statements.  Thus, the
undisputed facts in the summary judgment record show that
Smith simply parroted what the Principals in the fraud told
him to say without taking any meaningful steps to verify
their claims.  The record, in short, reasonably supports no
other factual conclusion but that Smith's misrepresentation
about Malom's liquidity was wholly baseless.

The baselessness of Smith's misrepresentation, the SEC
argues, constitutes at least extreme recklessness, and therefore
scienter, as a matter of law. I agree. "'[R]epresentations and
opinions . . . given without basis and in reckless disregard of
their truth or falsity' establish scienter under Rule 10b-5."
SEC v. Bremont, 954 F. Supp. 726, 730 (S.D.N.Y. 1997) (quoting
Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 48 (2d Cir.
1978); see also Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.
1985) ("[A]n opinion that has been issued without a genuine
belief or reasonable basis is an 'untrue' statement which, if
made knowingly or recklessly, is culpable conduct actionable
under § 10(b) and Rule 10b-5."; SEC v. Kenton Capital, Ltd., 69
F. Supp. 2d 1, 10 (D.D.C. 1998); SEC v. Deyon, 977 F. Supp. 510,
518 (D. Me. 1997) (defendant who "relied exclusively on
[principals'] representations" in making material
misrepresentation acted with scienter); cf. Glassman v.
Computervision Corp., 90 F.3d 617, 627 (1st Cir. 1996) (in
context of financial forecasts, inaccurate predictions "may be
actionable to the extent they are not reasonably based on, or
are inconsistent with, the facts at the time the forecast is
made."). If the summary judgment record suggested that Smith
had taken any meaningful step to independently evaluate Malom's

liquidity, I would probably be unable to grant summary judgment, since a reasonable finder of fact could infer from such a step that Smith had some legitimate basis, however tenuous, for his statement.  As I have explained, however, this record permits only the conclusion that Smith's misrepresentation of Malom's liquidity lacked any legitimate basis at all.  Because this factual conclusion is not in genuine dispute, it necessarily follows that Smith made his statement with extreme recklessness, and therefore with scienter.  See Bremont, 954 F. Supp. at 730.

Smith does not address, much less dispute, the SEC's legal contention that a wholly baseless misrepresentation evinces extreme recklessness, and therefore scienter, under Rule 10b-5 and Section 17(a).  Instead, and construing Smith's submission as generously as possible, I can discern only two legal arguments that Smith offers in opposition to summary judgment, neither of which is persuasive.  First, he simply argues that "disputed facts relating to whether [his] alleged reckless conduct in his representation of his client that supposedly aided or abetted that client in its engagement of fraudulent schemes involving conduct that is regulated by the [SEC] should be decided by the trier of facts."  Doc. No. 27 at 1-2.  To the extent I can understand this sentence at all (and to the extent

18

it does not simply beg the question), I take it to argue that
whether a defendant acted with extreme recklessness is a
question that must be decided at trial.  But there is no
unwavering rule that requires a trial when a scienter is an
element of the claim under review.  To the contrary, "[a]lthough
it is unusual to grant summary judgment on scienter, summary
judgment on this issue is sometimes appropriate." Ficken, 546
F.3d at 51.  "Even in cases where elusive concepts such as
motive or intent are at issue, summary judgment may be
appropriate if the nonmoving party rests," as Smith has, "merely
upon conclusory allegations, improbable inferences, and
unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco
Co., 896 F.2d 5, 8 (1st Cir. 1990).  Given the strength of the
SEC's proffered evidence of scienter and the inadequacy of
Smith's opposition to summary judgment, this is such a case.
See SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 525
(D.N.J. 1999) (awarding SEC summary judgment on Rule 10b-5 and
Section 17(a) claims where no reasonable jury could avoid
finding of scienter).

Second, Smith relies on multiple conclusory and unspecific
denials of direct knowledge about the fraud.  For reasons
already given, however, those denials do not serve to rebut the

19

SEC's summary judgment proffer or raise any genuine dispute of
material fact.  Moreover, because extreme recklessness, a lesser
mental state than direct knowledge, also satisfies the scienter
element under Rule 10b-5 and Section 17(a)(1), merely denying
direct knowledge of the fraud is legally insufficient to contest
scienter here.  See Ficken, 546 F.3d at 47.  If the scienter
element required a showing of direct knowledge, and if Smith
could point to a denial of direct knowledge that he made during
discovery under penalty of perjury, I would likely be unable to
grant summary judgment for the SEC.  See Velazquez-Garcia v.
Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir.
2007) ("[I]t is for the jury, not the judge, to determine . . .
credibility.").  Because extreme recklessness also satisfies the
scienter element, however, Smith's conclusory denials of direct
knowledge do not legally preclude summary judgment.

Thus, I conclude that no genuine dispute of material fact
exists regarding whether Smith acted with at least extreme
recklessness, and therefore with scienter, when he made his
April 2011 misrepresentation regarding Malom's liquidity.
Because that misrepresentation also easily satisfies the other
elements of Rule 10b-5 and Section 17(a), I grant the SEC's
motion for summary judgment on Counts One and Three.

**B.   Counts Two and Four: Aiding and Abetting Malom's Violations of Section 10(b) and Rule 10b-5**

In Counts Two and Four, the SEC alleges that Smith aided and abetted Malom's own violations of Rule 10b-5 and Section 17(a).  To prevail on a claim of aiding and abetting a violation of either provision, the SEC must prove: (1) that Malom itself committed a primary violation of the relevant provision; (2) that Smith either knew about or was reckless toward the primary violation; and (3) that Smith provided substantial assistance to Malom in committing the primary violation.[7]  See 15 U.S.C. §§ 77o(b), 78t(e); SEC v. Coven, 581 F.2d 1020, 1028 (2d Cir. 1978); SEC v. Power, 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007).

Beyond constituting an independent primary violation of Rule 10b-5 and Section 17(a), Smith's April 2011 misrepresentation of Malom's liquidity also meets each of the elements for aiding and abetting Malom's own violations of those provisions.  First, both Malom and its Principals committed a primary violation of Rule 10b-5 and Section 17(a) by entering into a "funding commitment" with USA Springs in June 2011.  See Doc. No. 16-6.  In that agreement, Malom promised to underwrite

---

[7] The 2010 passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act conclusively established that recklessness satisfies the scienter element of an aiding and abetting claim.  SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 800-01 (11th Cir. 2015).

and market structured notes that would help USA Springs meet its
acute need for financing.  See id. at 2.  Because the Principals
had no intention of underwriting any such notes, it is beyond
dispute that Malom's statements in the funding commitment were
knowingly false.  Second, for reasons already explained, Smith
acted with extreme recklessness by signing the April 2011
certification letter.  And third, there is no question that
Smith, by signing this certification letter, provided
substantial assistance to Malom in defrauding USA Springs.  The
Principals told Smith that they planned to show the letter to
prospective investors, and Smith endorsed the letter with that
understanding.  The Principals then showed the letter to USA
Springs, which relied in part on Smith's certification when it
agreed to invest money with Malom.  These undisputed facts show
that Smith provided substantial assistance to Malom by
associating himself with and participating in the Principals'
effort to attract new investors and seeking to make that effort
succeed.  See SEC v. Apuzzo, 689 F.3d 204, 214 (2d Cir. 2012).

    The undisputed facts, therefore, compel the conclusion that
Smith aided and abetted the Principals' primary violations of
Rule 10b-5 and Section 17(a) by endorsing the April 2011 letter,
including its misrepresentation of Malom's liquidity.

Accordingly, I grant summary judgment on Counts Two and Four.

### C.   Count Five: Violation of Securities Act Section 5

Section 5 of the Securities Act prohibits both the sale and the offer of sale of securities in interstate commerce that have not been registered with the SEC and are not otherwise exempt from registration. 15 U.S.C. § 77e(a). To prevail on its Section 5 claim against Smith, the SEC must prove the following three elements: (1) that no registration statement was in effect for the securities at issue here; (2) that Smith either sold or offered to sell those securities or was a necessary participant in the sale or offer to sell; and (3) that the sale or offer of sale of those securities was made using interstate transportation, communication, or the mails. See SEC v. Cavanagh, 1 F. Supp. 2d 337, 361, 372 (S.D.N.Y. 1998). Section 5 imposes no scienter requirement. Id. at 361.

No genuine dispute of material fact exists here that pertains to any of the elements of the SEC's Section 5 claim. It is undisputed that Malom and its Principals never registered the fictional "instruments" underlying the joint venture and structured note offering schemes. Furthermore, it is undisputed that Smith signed the certification regarding Malom to facilitate the USA Springs transaction. Without that

23

certification, USA Springs never would have agreed to invest in the structured note offering.  Smith, therefore, was a necessary participant in Malom's offer to sell an unregistered security. See id. at 372.[8]  Finally, there is no question that both Malom and Smith promoted the joint venture and structured note offerings through multiple channels of interstate commerce.  The SEC, therefore, has demonstrated both that no genuine dispute of fact exists pertaining to any element of its Section 5 claim and that it is entitled to judgment as a matter of law on that claim.  Thus, I grant the SEC's motion for summary judgment on Count Five.

**D.   Penalties**

The SEC asks for three types of relief against Smith: a permanent injunction, disgorgement, and civil penalties.  I address each in turn.

1.   Permanent Injunction

A permanent injunction is appropriate where a defendant has violated the securities laws and the SEC demonstrates a reasonable likelihood that the defendant will do so again in the future.  SEC v. Haligiannis, 470 F. Supp. 2d 373, 383 (S.D.N.Y.

---

[8] I have already explained why the instruments underlying the scheme qualify as securities as a matter of law.  See supra note 6.

2007) (citing SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99 (2d Cir. 1978)).  "The federal courts are vested with wide discretion when an injunction is sought to prevent future violations of the statutory securities laws." SEC v. John Adams Tr. Corp., 697 F. Supp. 573, 577 (D. Mass. 1988).  Factors that a court may consider in determining whether a defendant is reasonably likely to commit future violations of the securities laws include the egregiousness of the violation, the degree of scienter, the isolated or repeated nature of the violations, and the sincerity of the defendant's assurances against future violations. Haligiannis, 470 F. Supp. 2d at 384.

The SEC seeks a permanent injunction against Smith that enjoins him both from committing further violations of the securities laws and from participating in the offer or sale of any security in the future, including as a paymaster.  See Doc. No. 19.  The SEC's proposed injunction is warranted.  The undisputed evidence establishes that Smith contributed to the scheme with extreme recklessness as both an attorney and a paymaster.  Smith's participation in the scheme extended over multiple years and helped to persuade at least four investors to contribute, and lose, over $2 million to the fraud.  Smith has offered no assurance that he will not commit further violations

of the securities laws; to the contrary, he has expressed his intention to continue seeking work as a paymaster in the future. These facts all show a reasonable, if not strong, likelihood that Smith will continue to violate the securities laws.  See Haligiannis, 470 F. Supp. 2d at 384.  Furthermore, in his opposition to summary judgment, Smith does not address the SEC's requested injunctive relief or otherwise explain why such relief should not issue.  Based on these considerations, I grant the SEC's proposed injunctive relief as an appropriate remedy to prevent Smith from committing further violations of the securities laws.

    2.  Disgorgement

    Where a defendant is liable for securities fraud, "it is simple equity that a wrongdoer should disgorge his fraudulent enrichment." Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965).  In awarding disgorgement, a district court may exercise its "broad discretion" and order the defendant to pay prejudgment interest in addition to the principal amount that the defendant earned from the fraud. SEC v. Sargent, 329 F.3d 34, 40 (1st Cir. 2003).  The undisputed evidence here shows that Smith received $39,525 from the fraud, which the SEC has computed to yield an additional $3,817.88 in prejudgment

interest.  Smith does not contest these figures, and he does not
specifically object to the assessment of prejudgment interest.
Furthermore, I find that an award of prejudgment interest in
addition to disgorgement of the principal amount derived from
the fraud "is necessary to prevent" Smith "from receiving the
benefit of what would otherwise be an interest-free loan." SEC
v. Boey, 2013 DNH 101, 3-4 (quoting SEC v. Druffner, 802 F.
Supp. 2d 293, 298 (D. Mass. 2011)).  Therefore, I grant the
SEC's request and order Smith to disgorge $43,342.88, an amount
that includes both his principal earnings from the fraud and
prejudgment interest.

     3.  Civil Penalty

    In addition to disgorgement and injunctive relief, Sections
21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and 20(d) of the
Securities Act, 15 U.S.C. § 77t(d), both provide for the
imposition of civil monetary penalties against defendants found
liable for securities fraud.  See 15 U.S.C. §§ 77t(d)(1),
78u(d)(3)(A); Haligiannis, 470 F. Supp. 2d at 385.  These
statutes provide two methods for determining the amount of civil
penalties to be imposed.  Under the first method, which the SEC
asks me to apply, the court selects a dollar amount from among
three "tiers" of egregiousness prescribed by the statutes and

then multiplies that amount by the total number of the defendant's violations.  See 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A).  Under the second method, the court simply assesses the defendant's "gross pecuniary gain."  See 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A).

The SEC requests a maximum third-tier civil penalty against Smith under the first method.  Its briefing supporting this request, however, is inadequate.  Although the SEC identifies a specific amount to be multiplied by the number of Smith's securities law violations – perhaps unsurprisingly, the maximum amount that the SEC claims is allowed for a third-tier violation – it does not specify in any of its pleadings just how many violations Smith committed, making it impossible to compute a specific total penalty amount under the first method.[9]  I decline to make this determination myself in the absence of any guidance

---

[9] Although the SEC represents that the maximum amount allowed by the statutes per violation for individual defendants is $150,000, it appears that the statutory maximum is actually $100,000.  See 15 U.S.C. §§ 77t(d)(2)(C) (for third-tier violation, "the amount of penalty . . . shall not exceed . . . $100,000 for a natural person); 78u(d)(3)(B)(iii) (for third-tier violation, "the amount of penalty . . . shall not exceed . . . $100,000 for a natural person.").  If the SEC derives its $150,000 figure from a different source of authority, it does not cite it in its brief.  When it renews its motion for summary judgment on the civil penalty question, the SEC should identify the authority that allows for a $150,000 penalty per violation.

at all from the SEC.  Thus, I deny the SEC's request for a
monetary civil penalty without prejudice.  If the SEC intends to
pursue its request for a civil penalty in light of this
Memorandum and Order, it should file a new motion for summary
judgment on the civil penalty issue.  In its renewed motion, the
SEC should both identify each alleged violation on which it
bases its claim for a civil penalty under the first method and
specify the evidence supporting each violation.[10]

## IV.   CONCLUSION

     For the reasons set forth in this Memorandum and Order, I
grant the SEC's motion for summary judgment (Doc. No. 15) to the
extent that it seeks a permanent injunction.  Additionally, I
order Smith to pay disgorgement in the amount of $43,342.88.  I
deny without prejudice the SEC's motion for summary judgment on
its request for a civil penalty.  Within fourteen days, the SEC
shall either renew its motion for summary judgment on this issue
as directed in this Memorandum and Order or ask the Court for

---

[10] I reiterate that the SEC would have been well served to
structure its complaint and summary judgment motion in this way
from the beginning.  See supra note 5.  Alternatively, the SEC
remains free to request a civil penalty under the second method,
or to no longer seek a civil penalty at all.

the entry of judgment.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 2, 2015

cc:  Stephen W. Simpson, Esq.
     Allen R. Smith, Esq.